# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

—————————————

**No. ACM 24057**

—————————————

**UNITED STATES**
*Appellee*

**v.**

**Tavaris BANKS**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

—————————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 18 December 2025

—————————————

*Military Judge*: Christopher D. James.

*Sentence*: Sentence adjudged 3 February 2023 by SpCM convened at Osan Air Base, Republic of Korea. Sentence entered by military judge on 17 March 2023: Confinement for 45 days, reduction to E-5 with reduction below E-6 suspended until 16 September 2023, and a reprimand.

*For Appellant*: Major Frederick J. Johnson, USAF.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Regina Henenlotter, USAF; Major Abishek S. Khambli, USAF; Major Kate E. Lee, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEARLEY, and MCCALL, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Judge KEARLEY and Judge MCCALL joined.

—————————————

---

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice, 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.)).

*United States v. Banks*, No. ACM 24057

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

JOHNSON, Chief Judge:

A special court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of assault consummated by a battery in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[2,3] Appellant elected sentencing by the military judge, who sentenced Appellant to confinement for three months, reduction to the grade of E-4, and a reprimand. The convening authority reduced Appellant's term of confinement to 45 days and approved a reduction in grade only to E-5, with reduction below E-6 suspended until 16 September 2023, at which time, unless the suspension had been vacated, the suspended part of the sentence would be remitted. The convening authority provided the language for the reprimand.

Appellant raises seven issues on appeal: (1) whether the convening authority impermissibly considered the race of potential court members when detailing members to the court-martial; (2) whether the findings of guilty are factually sufficient; (3) whether Appellant received ineffective assistance of counsel; (4) whether the military judge impermissibly impeded public access to Appellant's trial; (5) whether Appellant is entitled to relief for unreasonable post-trial delay; (6) whether Appellant's convictions should be set aside because the investigator was derelict in his duties; and (7) whether the findings of guilty and sentence should be set aside because "[t]he reference in the reprimand to [Appellant] being a Security Forces member highlights the wrongfulness of the conviction."[4]

We have carefully considered issues (6) and (7) and find they warrant neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

_____

[2] Unless otherwise indicated, all references to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] The court-martial found Appellant not guilty of one specification of false official statement in violation of Article 107, UCMJ, 10 U.S.C. § 907.

[4] Appellant personally raises issues (6) and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

We find no error materially prejudicial to Appellant's substantial rights with respect to issues (1) through (4), but we find relief for excessive post-trial delay appropriate, and take corrective action in our decretal paragraph.

## I. BACKGROUND

On the night of 13–14 August 2022, Appellant and several colleagues were off-duty at a bar near the main gate of Osan Air Base (AB), Republic of Korea. RE, an intoxicated Airman who was not part of Appellant's group, began to verbally harass one of Appellant's companions. Appellant attempted to defuse the situation by helping to separate the two, but as he did so RE made provocative comments toward Appellant as well. In response, Appellant's companions moved Appellant outside of the bar.

According to Appellant's later statements, RE left the bar shortly thereafter and Appellant observed RE was still "saying inappropriate things." Appellant told RE to "watch his mouth." In response, RE pushed Appellant with his shoulder as he passed by.

RE then walked up the street away from the bar. From this point, the ensuing incident is captured on security camera recordings that were entered in evidence at trial. RE threw a water bottle ahead of him onto the street in the general direction of five other Airmen who were standing on a corner outside a shop. When RE reached the corner he picked up the water bottle and exchanged words with the other Airmen. Three times RE began to walk away, but then returned to continue speaking with the group.

As this encounter was going on, Appellant walked up the street toward RE, but apparently outside RE's direct line of sight. Appellant was carrying an item in his right hand, which he transferred to his left hand as he approached RE. As Appellant reached RE, RE shook the water bottle at one of the other Airmen, splashing the Airman with water. RE then appeared to notice Appellant and turned toward him. As RE did so, Appellant immediately struck RE in the face with his right fist. RE fell backward to the ground, hitting his head on the surface of the street. Appellant briefly stood above the motionless RE, leaning over him and apparently looking into his face. Appellant then departed the area, as did the other five Airmen present. The video recording depicts RE getting to his feet after a period of time, apparently leaving a small pool of blood on the street, and unsteadily walking in a circle and then out of view.

Eventually, someone summoned the Air Force security forces Town Patrol to assist RE, who was bleeding from his head. The Town Patrol provided first aid and called for medical assistance. RE was initially taken by ambulance to a Korean hospital and then transferred to the hospital on Osan AB. He had suffered a cut to his head that required six stitches. RE later testified that he

had no memory of any of the events described above until he "woke up" in a Korean ambulance on his way to the first hospital, at which point he made a short video recording of himself with his phone.

The following night, a civilian shop owner showed members of the Town Patrol the video recordings of the incident, which led to Appellant's identification. Appellant agreed to be interviewed by security forces investigators and acknowledged he struck RE. Appellant stated, *inter alia*, that "in hindsight" he "wasn't in danger at all" when he struck RE, and that he made "a bad decision." Appellant initially declined to provide a written statement immediately following the interview. However, a few days later Appellant provided a written statement in which Appellant again acknowledged striking RE, but stated that when he did so he believed RE was about to strike him.

## II. DISCUSSION

### A. Court Member Selection

#### 1. Additional Background

The convening order, dated 20 October 2022, detailed eight officers and six enlisted members to Appellant's court-martial. On 23 January 2023, the convening authority's staff judge advocate (SJA) excused two of the officer members "without replacement."

On 27 January 2023, Appellant signed a memorandum addressed to the convening authority. The memorandum stated:

> Pursuant to Article 25, Uniform Code of Military Justice[, 10 U.S.C. § 825], I respectfully request a diverse panel. Because the law permits you to take into account race, rank, and gender for benign purposes, I respectfully make this request. On 23 January 2023, you excused two members of the panel without providing a replacement. Both excused members are minorities. One of the two excused members is an African-American female . . . and the other is an Asian-American male. I was notified today, 27 January 2023, of the excusals with no replacements. As an African-American, their exclusion concerns me and my attorneys greatly. Therefore, I would further request that the replacement of those two members that you select are diverse in terms of race, ethnicity, and rank, so that the impartiality of my panel is above all reproach. Thank you for ensuring I get a fair trial and a truly diverse panel.

On 30 January 2023, the convening authority signed a memorandum addressed to his SJA. The memorandum noted the SJA's excusal of the two

members on 23 January 2023, as well as Appellant's 27 January 2023 memorandum requesting "the excused members be replaced with members who are diverse in terms of race, ethnicity, and rank to ensure a fair and impartial trial." The convening authority then stated: "By reason of their age, education, training, experience, length of service, and judicial temperament, under Article 25, UCMJ, I nominate the following individuals to serve as replacement court members . . . ." From a list of four names in the memorandum, the convening authority put his initials by the names of Major (Maj) VM and Master Sergeant (MSgt) NB. Among the listed attachments to the memorandum were 12 pages of "Court Member Data Sheets." On appeal, this court granted Appellant's motion to attach the data sheets for Maj VM and MSgt NB to the record.[5] These data sheets identify both Maj VM and MSgt NB as African American and female.

Neither party challenged Maj VM or MSgt NB for cause nor exercised a peremptory challenge against them. Maj VM was subsequently excused following voir dire; MSgt NB ultimately served on the panel that convicted Appellant. Apart from Appellant's 27 January 2023 memorandum requesting a diverse panel of court members, the Defense did not challenge or object to the court member selection process.

**2. Law**

Court-martial composition issues not raised at trial are forfeited and reviewed on appeal for plain error. *United States v. King*, 83 M.J. 115, 120–21 (C.A.A.F. 2023), *cert. denied*, 144 S. Ct. 190 (2023). Under the plain error standard of review, the "[a]ppellant bears the burden of establishing: (1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced

---

[5] In *United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020), the United States Court of Appeals for the Armed Forces (CAAF) held that, in general, a Court of Criminal Appeals (CCA) reviewing a case pursuant to Article 66, UCMJ, 10 U.S.C. § 866, "cannot consider matters outside the 'entire record,'" defined as the "record of trial," "allied papers," and "briefs and arguments" that the litigants might present regarding the record of trial and allied papers. However, the CAAF acknowledged precedent permitting CCAs "to consider affidavits and gather additional facts" when "necessary for resolving issues raised by materials in the record." *Jessie*, 79 M.J. at 444. This court has previously questioned whether the general prohibition in *Jessie* retains its force in light of subsequent changes to Article 66, UCMJ, which removed particular language the CAAF relied on in *Jessie*. *See United States v. Giles*, No. ACM 40482, 2024 CCA LEXIS 544, at *27 n.5 (A.F. Ct. Crim. App. 23 Dec. 2024) (unpub. op.). Assuming for purposes of analysis, as we did in *Giles*, that the limitations set forth in *Jessie* still apply, we conclude we may consider these data sheets for purposes of this appeal because they are "necessary to resolve an issue raised by the record." *Jessie*, 79 M.J. at 444.

a substantial right." *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018) (citation omitted). In undertaking a plain error analysis, we "consider whether the error is obvious at the time of appeal, not whether it was obvious at the time of the court-martial." *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008). "An appellant gets the benefit of changes to the law between the time of trial and the time of his appeal." *United States v. Tovarchavez*, 78 M.J. 458, 462 (C.A.A.F. 2019) (citations omitted).

"When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." 10 U.S.C. § 825(e)(2).

In *United States v. Crawford*, the United States Court of Military Appeals held the intentional selection of African American servicemembers to serve on courts-martial in order to ensure fair representation of the community was consistent with constitutional guarantees of equal protection. 35 C.M.R. 3, 13 (C.M.A. 1964); *see also United States v. Smith*, 27 M.J. 242, 249 (C.M.A. 1988) ("[A] commander is free to require representativeness in his court-martial panels and to insist that no important segment of the military community -- such as blacks, Hispanics, or women -- be excluded from service on court-martial panels.").

In *Batson v. Kentucky*, the United States Supreme Court held a criminal defendant "ha[s] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria," and in particular "the Equal Protection Clause[ ] forbids the prosecutor to challenge potential jurors solely on account of their race" through the exercise of peremptory challenges. 476 U.S. 79, 85–86, 89 (1986).

In *United States v. Jeter*, the United States Court of Appeals for the Armed Forces (CAAF), overruled *Crawford* in light of *Batson*, holding "[i]t is impermissible to exclude or intentionally include prospective members based on their race." 84 M.J. 68, 73 (C.A.A.F. 2023). The CAAF explained, "whenever an accused makes a prima facie showing that race played a role in the panel selection process at his court-martial, a presumption will arise that the panel was not properly constituted," which the Government may then attempt to rebut. *Id.* at 70. In *Jeter*, "trial defense counsel challenged the makeup of the panel, citing a 'systematic exclusion of members based on race and gender.' The military judge noted that '[i]t appears that [the panel] is all white men . . . .'" *Id.* at 71 (alterations in original). On appeal, the CAAF found the appellant had made a "prima facie showing that gives rise to a presumption that race was allowed to enter the selection process." *Id.* at 74. In support of this conclusion, the CAAF cited "racial identifiers" that were included in court member questionnaires provided to the convening authority, as well as "other evidence

before the court of criminal appeals," and "the command's understandable belief that the *Crawford* case . . . was still good law." *Id.* The CAAF held, "[u]nder these facts, we reverse." *Id.*

"The invited error doctrine prevents a party from 'creat[ing] error and then tak[ing] advantage of a situation of his own making [on appeal].'" *United States v. Martin*, 75 M.J. 321, 325 (C.A.A.F. 2016) (quoting *United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999)). "As a result, '[i]nvited error does not provide a basis for relief.'" *Id.* (quoting *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996)). Whether the defense invited an error is a question of law, which we review de novo. *See id.* (citation omitted).

### 3. Analysis

Appellant contends the findings of guilty and sentence must be set aside in light of *Jeter*, which the CAAF decided after Appellant's court-martial concluded. Although at the time of the court-martial the existing precedent of *Crawford* and *Smith* expressly permitted convening authorities to consider race in order to ensure fair representation on court-martial panels, Appellant cites *Tovarchavez* for the principle that "[a]n appellant gets the benefit of changes to the law" after his trial. 78 M.J. at 462. Appellant contends the record establishes a prima facie showing the convening authority did consider race in the selection of court members, which the Government cannot rebut, constituting a "plain and obvious error warranting automatic reversal." In response, the Government contends, *inter alia*, Appellant invited the error by requesting a racially diverse panel, that Appellant should be judicially estopped from adopting on appeal a position that contradicts a position he successfully asserted at trial, and that in any event Appellant has failed to make a prima facie showing that race played a role in the selection of panel members.

As an initial matter, we agree with Appellant that he has made a prima facie showing the convening authority considered race in the selection of panel members—in particular, Maj VM and MSgt NB. Appellant specifically requested that the convening authority consider race in order to ensure a racially diverse panel. The convening authority acknowledged this request in writing in his memorandum to the SJA selecting Maj VM and MSgt NB. The record demonstrates the convening authority was provided with data sheets indicating Maj VM and MSgt NB were African American, the same race as Appellant. Under these circumstances, it does not require sophisticated statistical analysis to conclude it was unlikely coincidental that two out of two replacement members happened to be African American. The convening authority's assertion that he considered the Article 25, UCMJ, criteria in selecting Maj VM and MSgt NB is not inconsistent with the conclusion that he *also* considered their race, particularly in light of the facts in this case. Moreover, we find the

Government has not rebutted Appellant's prima facie showing, and that the error is plain and obvious in light of *Jeter*.

However, we also conclude Appellant is not entitled to relief because he invited this error, and invited errors are generally not a basis for relief. *Martin*, 75 M.J. at 325 (citation omitted). Appellant, citing the fact that he is himself African American, expressed great concern that an African American member and an Asian American member had been removed from the panel without replacement. He specifically requested a panel that was racially diverse. The plain implication is that Appellant wanted the convening authority to ensure racial minority representation on the panel. The convening authority evidently did so, while specifically acknowledging Appellant's request. The invited error doctrine prevents Appellant from making a request to the convening authority before trial, and then obtaining relief on appeal from the granting of Appellant's own request.

Appellant contends invited error cannot apply "because it was not error at the time." He argues, "[a]n error is unreviewable if a person *both* invites the error *and* intentionally relinquishes or abandons a known right," citing *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc) (emphasis added). We are not persuaded. Under the CAAF's well-established precedent, "intentional relinquishment or abandonment of a known right" is the hallmark of affirmative waiver. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)); *see also United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (quoting *Gladue*); *United States v. Ahern*, 76 M.J. 194. 197 (C.A.A.F. 2017) (same). If, as Appellant contends, every instance of invited error required intentional relinquishment or abandonment of a known right, then every instance of invited error would also constitute waiver, and invited error would hardly exist as a distinct doctrine. However, in *Martin*, issued in 2016, considerably after *Gladue*, the CAAF evidently recognized invited error as a doctrine distinct from waiver. 75 M.J. at 325. We do not believe this was an error or oversight by our superior court. We can readily perceive the distinction between waiver—intentionally deciding *not to do something*, *i.e.*, not to assert a right—and invited error—affirmatively *doing something to cause* the Government, military judge, or other relevant actor to commit an error at the defense's request. The instant case presents invited error as defined in *Martin*; having caused the error, Appellant now attempts to take advantage on appeal of the situation he created. *Id.*

We recognize *Jeter* implies that demonstrated improper consideration of race in the court member selection process always requires reversal. *See Jeter*, 84 M.J. at 74 (first citing *Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017), then citing *Batson*, 476 U.S. at 100). However, we agree with the United States Court of Appeals for the Seventh Circuit that even structural errors may be

8

subject to the invited error doctrine. *See United States v. Gaya*, 647 F.3d 634, 640 (7th Cir. 2011) (holding there is "no reason to exempt 'structural errors'" from the invited error doctrine) (citations omitted); *see also Durden v. State*, 99 N.E.3d 645, 655 (Ind. 2018) (citing *Gaya* and finding "no reason to exempt structural errors from the invited-error doctrine"); *United States v. Teerlink*, 141 F.4th 1126, 1131 (10th Cir. 2025) (applying invited error to an alleged constitutional violation lowering the Government's burden of proof in a criminal prosecution). Under the circumstances of this case, where there is no indication the selection of Maj VM or MSgt NB undermined the reliability of the factfinding function of the court-martial, we find invited error precludes Appellant from obtaining relief from a *Jeter* violation on appeal.

## B. Factual Sufficiency

### 1. Law

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and (2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J.

at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id*. at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id*. at 131 (internal quotation marks omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citations omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id*. at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id*. Second, we "must be clearly convinced of the correctness of this decision." *Id*.

In order to convict Appellant of assault consummated by a battery as alleged in the Specification of Charge II, the Government was required to prove that Appellant: (1) did bodily harm to RE, specifically by "striking [RE] on the face with his hand;" (2) the bodily harm was done unlawfully; and (3) the bodily harm was done with force or violence. *See* 10 U.S.C. § 928(a)(3); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(3)(a). "'Bodily harm' means an offensive touching of another, however slight." *MCM*, pt. IV, ¶ 77.c.(1)(a).

It is a defense to any non-aggravated assault punishable under Article 128, UCMJ,

> that the accused (A) Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on the accused; and (B) Believed that the force that accused used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.

R.C.M. 916(e)(3). "The principles of self-defense under [R.C.M. 916(e)(3)] apply to defense of another." R.C.M. 916(e). Where the evidence raises the issue of self-defense or defense of another, "the prosecution shall have the burden of proving beyond a reasonable doubt that the defense did not exist." R.C.M. 916(b)(1).

### 2. Analysis

Appellant contends the findings of guilty were factually insufficient. He does not deny that he struck RE in the face with his hand, of which there is overwhelming proof through witness testimony, video recordings, and Appellant's own pretrial statements and testimony at trial. Instead, Appellant

argues the Government failed to prove beyond a reasonable doubt that the defenses of self-defense and defense of another did not exist.

Appellant cites several factors in support of his argument. He contends RE was drunk, had acted aggressively toward Appellant and another individual at the bar, and had initiated another confrontation with the five Airmen at the street corner. Appellant notes that RE splashed one of the Airmen with water just before Appellant struck. Appellant's pretrial written statement and in-court testimony assert Appellant believed RE was a threat and was about to strike Appellant when Appellant acted in self-defense to prevent harmful or offensive contact. Appellant contends "[a]ny reasonably prudent person in [Appellant's] situation would have believed" RE was about to inflict bodily harm on him. Appellant told investigators and testified at trial that he did not strike RE "hard" with his full strength, and he only struck one time. Appellant contends that in light of the evidence, the Government failed to disprove both prongs of the test for self-defense and defense of another. *See* R.C.M. 916(e)(3) and (5).

As an initial matter, we find Appellant has made a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the findings. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 129. The military judge found the evidence was sufficient to raise the potential defenses of self-defense and defense of another, and instructed the court members accordingly. On appeal, Appellant explains why, in his view, the Government failed to disprove these defenses in light of specific evidence introduced at trial. This is more than simple general disagreement with a verdict. *See United States v. Valencia*, 85 M.J. 529, 535 (C.A.A.F. 2024).

However, we are not clearly convinced the findings of guilty were against the weight of the evidence. The video recordings depict Appellant punching RE in the face shortly after he reached RE's position. RE scarcely noticed Appellant before Appellant struck him. The testimony of the other witnesses essentially describes Appellant suddenly appearing and striking RE without any sort of interaction between RE and Appellant. In Appellant's initial interview with the investigators, he admitted that he had not been "in danger at all" from RE and had made "a bad decision." In that interview, he did not claim he was concerned about RE committing bodily harm against any other individual. In Appellant's later written statement, composed after Appellant had more time to reflect on his circumstances, he asserted he acted in self-defense; during his trial testimony, Appellant contended he believed RE might commit bodily harm against himself or others. However, the court members might reasonably discount these later claims as self-serving, less credible than Appellant's initial admissions, and unsupported by the other evidence. Accordingly, we do not find Appellant's conviction factually insufficient.

## C. Ineffective Assistance of Counsel

### 1. Additional Background

During the findings portion of the trial, the Defense called one witness—Appellant himself. In addition, the Defense introduced several photographs depicting the area where the charged assault took place, and a short phone-recorded video of RE taken during RE's encounter with the five Airmen on the corner prior to the assault. The Defense did not introduce evidence of Appellant's good military character during findings.

During the pre-sentencing portion of the trial, the Defense called two Air Force officers and two Air Force senior noncommissioned officers who testified about Appellant's accomplishments, positive traits, and good rehabilitation potential. The Defense also presented the testimony of Appellant's sister who also described Appellant's positive character traits, accomplishments, and "extremely high" rehabilitation potential, as well as difficult circumstances Appellant had overcome in his youth. In addition, the Defense presented oral and written unsworn statements from Appellant, six character letters, citations from medals Appellant received, and a pretrial recommendation from RE to the SJA that Appellant receive nonjudicial punishment for the assault.

This court granted a government motion to compel declarations from Appellant's trial defense counsel, Maj JB and Captain (Capt) MB, addressing Appellant's claims that they were ineffective by failing to present good military character evidence during the findings portion of the trial. Both counsel provided responsive declarations which are attached to the record. Maj JB explained:

> Based on a review of the evidence, trial preparations, and our conversations with our client, we decided not to introduce good military character evidence during findings for three primary reasons: (1) to avoid [Mil. R. Evid.] 404(b) evidence from being introduced; (2) to avoid the [G]overnment making any negative inferences to [Appellant's] deployed combat experiences; and (3) during [Appellant's] pretrial sworn testimony prep, we had concerns with his ability to be cross-examined on certain topics.

With regard to the first proffered reason, Maj JB explained the Government had provided pretrial notice of uncharged misconduct it may seek to introduce pursuant to Mil. R. Evid. 404(b). Specifically, this notice indicated the Government was aware of an alleged incident approximately eight months before the charged offenses during which Appellant, while "both intoxicated and violent," "used his position and rank as a security forces member to inappropriately touch a civilian employee." The military judge had deferred ruling on the admissibility of this evidence, and the Government had not attempted to

introduce it in its case-in-chief. Trial defense counsel were also concerned about "another issue where [Appellant] was 'identified as receiving controlled Air Force testing material.'" Capt MB's declaration was generally consistent with Maj JB, and emphasized the perceived "strategic necessity" of not "open[ing] the door to harmful evidence" in the Government's possession.

**2. Law**

The Sixth Amendment[6] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). "Scrutiny of counsel's performance should be highly deferential." *United States v. Metz*, 84 M.J. 421, 428 (C.A.A.F. 2024) (citing *Strickland*, 466 U.S. at 689). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475. With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

"The accused may offer evidence of the accused's pertinent trait and, if the evidence is admitted, the prosecution may offer evidence to rebut it." Mil. R. Evid. 404(a)(2)(A). Such evidence includes "evidence of [the accused's] good

---

[6] U.S. CONST. amend. VI.

military character if that trait is pertinent to the charged offense." *United States v. Humpherys*, 57 M.J. 83, 92 (C.A.A.F. 2002). In general, good military character may be a pertinent trait where an accused is charged with assault consummated by a battery in violation of Article 128, UCMJ. *See* Mil. R. Evid. 404(a)(2)(A).

> When evidence of a person's character or character trait is admissible, it may be proved by testimony in the form of testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the military judge may allow an inquiry into relevant specific instances of the person's conduct.

Mil. R. Evid. 405(a). "Extrinsic evidence of prior acts of misconduct is not admissible to rebut opinion evidence of good military character." *Humpherys*, 57 M.J. at 92 (citations omitted).

### 3. Analysis

Appellant's assignments of error brief asserts trial defense counsel were ineffective by failing to present a good military character defense during the findings portion of the trial. Appellant contends the Defense's sentencing case and Appellant's performance reports indicate trial defense counsel had ample material with which to present such a defense. Appellant contends this failure has no reasonable explanation because the record of trial "reveals no hint of any adverse information about [Appellant's] military character," and it fell measurably below the standard of performance. Appellant further contends such a defense offered a reasonable probability of a different result, and would have complemented the Defense's theory of the case that the bodily harm Appellant inflicted on RE was in self-defense and not unlawful.

Applying the three-part test from *Gooch*, we find Appellant's allegation is true in that trial defense counsel could have presented a good military character defense, but elected not to. However, with due deference to the applicable presumption of competence, we find a reasonable explanation for this choice, and trial defense counsel did not fall measurably below the standard of performance expected of fallible lawyers. Most significantly, Maj JB and Capt MB explained they were concerned that presenting evidence of good military character would open the door to Appellant's alleged aggressive and alcohol-related misconduct directed at a civilian employee, as well as information regarding his improper possession of controlled testing material. Trial defense counsel could reasonably fear such information would create a negative impression with the court members that would undermine their theory that Appellant acted in self-defense, as well as the credibility of Appellant's own testimony.

In his reply brief, Appellant contends the trial defense counsel's concerns were unreasonable and betray a misunderstanding of the law, because extrinsic evidence of the alleged prior acts of misconduct would not be admissible to rebut opinion evidence of good military character. *See Humpherys*, 57 M.J. at 92 (citations omitted). Appellant concedes trial counsel might have been able to cross-examine opinion witnesses about their knowledge of such instances. However, assuming trial defense counsel had called opinion witnesses who were unaware of the alleged prior misconduct, the Government would be limited to eliciting responses to the effect that the witness had no such knowledge.

Nevertheless, applying the high deference appropriate to "[s]crutiny of counsel's performance," particularly in a trial with court members, we are not persuaded trial defense counsel's decision to avoid mention of these prior instances on cross-examination was unreasonable. *Metz*, 84 M.J. at 428 (citation omitted). Even if the witnesses denied such knowledge, and the Government could not use the alleged misconduct to directly rebut the good military character defense, trial defense counsel could reasonably fear the references could create a negative impression with the court members and detract from the Defense's self-defense theory and Appellant's testimony.

In addition, we are not persuaded evidence of Appellant's good military character would have created a reasonable probability of a more favorable result in light of the evidence presented. As described above, the assault was captured on video and witnessed by several other Airmen. The video and witness testimony simply do not support that Appellant was in any reasonable fear of RE when Appellant struck him in the face. Appellant, who had been drinking alcohol, followed RE down the street after an unfriendly confrontation at the bar. Appellant struck RE when he reached him, almost before RE realized he was there. The self-defense theory is further undermined by Appellant's initial admissions to security forces investigators that he "wasn't in danger at all" and made a "bad decision" when he assaulted RE. In light of the direct evidence of the offense, favorable opinion testimony from Air Force members who had known Appellant in the past would likely carry little weight.

Accordingly, we find Appellant has failed to demonstrate he is entitled to relief for ineffective assistance of counsel.

## D. Public Access to Trial

### 1. Additional Background

As described *supra*, security forces members obtained two video recordings of the charged assault Appellant committed on RE. During a pretrial hearing on a government motion to preadmit evidence, these recordings were marked as Prosecutions Exhibits 1 and 2 for Identification. The military judge stated he had previously viewed these videos. As trial counsel prepared to play these

videos during witness testimony during the hearing, the military judge engaged in the following exchange:

> [Military Judge]: [W]hile I'm thinking about it, I do want to position it -- eventually, I want [the screen] positioned so that the members and everyone can see it. But the gallery doesn't need to see this, in my opinion.
>
> Defense counsel, do you have any objection to that [course of action]?
>
> [Trial Defense Counsel]: No, Your Honor.
>
> [Military Judge]: Okay. Trial counsel, I assume you have no position on it. Yes. So if we can bring that out a little bit, and yes, Defense Counsel, we'll make sure that you can see it as well as your client, but I don't really want it shown to the gallery.

Prosecution Exhibits 1 and 2 were played during the witness's testimony without displaying the videos to the spectators in the courtroom. Neither party objected to limiting the gallery's view of the videos. The exhibits were subsequently admitted as Prosecution Exhibits 1 and 2.

As trial counsel prepared to present the Government's opening statement, the military judge ascertained trial counsel intended to display Prosecution Exhibits 1 and 2 during the opening. The military judge stated, "I would prefer that the gallery not really watch it, to be honest. So I will just direct to the maximum extent possible that the gallery does not view the embedded videos, that would be acceptable." Neither party objected to the military judge's direction.

Later, trial counsel played Prosecution Exhibits 1 and 2 during a witness's testimony on findings. Before trial counsel did so, the military judge stated:

> I'm trying to display the video so that it does not display to the gallery. I don't believe that the gallery needs to see this video, to be honest. It's going to be displayed on a laptop computer because the [D]efense, and more importantly the accused, is entitled to see everything that is being displayed to the members. And it will be displayed on a [video teleconferencing screen], but only positioned to the members. So I would just ask the gallery that either position yourselves so you're not viewing the video that's being displayed, or look away whenever the video is being displayed. Thank you.

Neither party objected to the military judge's restriction on the spectators' viewing of Prosecution Exhibits 1 and 2.

During the direct examination of another witness, trial counsel showed the witness a portion of Prosecution Exhibit 1. Before trial counsel did so, the military judge directed, "[T]o the maximum extent possible, if you are able to do that on a laptop [vice the video teleconferencing screen] and then get it so that it displays that, that would be better." Trial counsel responded, "Yes, Your Honor." Again, neither party objected to the military judge's direction.

**2. Law**

An appellant's failure to preserve an issue at trial raises the question whether the appellant has forfeited or waived the issue on appeal. *See Ahern*, 76 M.J. at 197. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Gladue*, 67 M.J. at 313 (quoting *Olano*, 507 U.S. at 733) (additional citation omitted).[7] Appellate courts review forfeited issues for plain error, but an effective waiver leaves no error to correct on appeal. *Davis*, 79 M.J. at 331 (C.A.A.F. 2020) (additional citation omitted). Plain error occurs where "(1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right." *Robinson*, 77 M.J. at 299 (citation omitted).

Whether an appellant has waived or forfeited an issue is a legal question we review de novo. *United States v. Schmidt*, 82 M.J. 68, 72 (C.A.A.F. 2022). However, "[w]hen constitutional rights are at issue, we have applied a presumption against finding waiver." *United States v. Blackburn*, 80 M.J. 205, 209 (C.A.A.F. 2020) (citing *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018)). "A waiver of a constitutional right is effective if it 'clearly established that there was an intentional relinquishment of a known right.'" *Jones*, 78 M.J. at 44 (quoting *United States v. Sweeney*, 70 M.J. 296, 303–04 (C.A.A.F. 2011)).

"In all criminal prosecutions, the accused shall enjoy the right to . . . a public trial." *United States v. Hasan*, 84 M.J. 181, 204 (C.A.A.F. 2024) (omission in original) (citing U.S. CONST. amend. VI.) The constitutional right to a public trial applies to courts-martial. *Id.* (citations omitted). However, "the right to an open trial may give way in certain cases to other rights or interests." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). The United States Supreme Court has explained:

> [A] party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court

---

[7] Waiver may also occur by operation of law. *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018).

must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48. In military courts, Rule for Courts-Martial (R.C.M.) 806 also provides for public trials and provides a similar standard for closing court-martial proceedings:

Courts-martial shall be open to the public unless (A) there is a substantial probability that an overriding interest will be prejudiced if the proceedings remain open; (B) closure is no broader than necessary to protect the overriding interest; (C) reasonable alternatives to closure were considered and found inadequate; and (D) the military judge makes case-specific findings on the record justifying closure.

R.C.M. 806(b)(4); *see also Hasan*, 84 M.J. at 205 (noting "R.C.M. 806 mirrors the *Waller* test").

Erroneous closure of the courtroom has been treated as structural error. *Hasan*, 84 M.J. at 205 (footnote omitted) (citing *Weaver*, 582 U.S. at 290). However, not every structural error requires reversal, and "when there has been 'a violation of the public-trial guarantee. . . .[,] the remedy should be appropriate to the violation,' and a remedy should not be imposed that 'would be a windfall for the defendant, and not in the public interest.'" *Id.* at 206 (omission and alteration in original) (quoting *Waller*, 467 U.S. at 49–50).

### 3. Analysis

Appellant contends the military judge violated Appellant's right to a public trial when he prevented the court-martial spectators from viewing Prosecution Exhibits 1 and 2. He argues the military judge had no justification for such measures, and notes the military judge articulated no clear reason for them. Appellant concedes "the military judge did not fully close the trial or outright prohibit any spectators," but asserts that preventing spectators "from viewing particular exhibits meant the trial was not fully public." He contends the military judge committed plain error and asks this court to set aside the findings and sentence.

In response, the Government contends Appellant waived the issue, pointing to trial defense counsel's affirmative statements during the motions hearing that the Defense had no objection. We agree the Defense waived the issue with respect to the display of Prosecution Exhibits 1 and 2 during the motion hearing. In that instance, trial defense counsel did not merely fail to object, but "affirmatively declined to object" when specifically asked by the military judge. *Davis*, 79 M.J. at 331. However, in light of the presumption against finding waiver of constitutional rights, *see Blackburn*, 80 M.J. at 209 (citations omitted), we decline to extend this waiver to the subsequent occasions when the

18

military judge gave instructions to counsel and to the spectators without eliciting an affirmative declination to object. Given the prevailing presumption, we will not impute the Defense's earlier waiver to every subsequent opportunity to object where trial defense counsel merely failed to do so.

Accordingly, we review for plain error the military judge's decision to prevent the spectators from viewing Prosecution Exhibits 1 and 2 during the Government's opening statement and witness testimony. We are not persuaded that the error, if any, was clear or obvious. *See Robinson*, 77 M.J. at 299. To begin with, the military judge did not close the courtroom or even exclude any spectators from observing the trial. There is a reasonable argument that the Sixth Amendment right to a public trial is simply not implicated in this circumstance. *See, e.g., People v. Robles-Sierra*, 488 P.3d 337, 341 (Colo. App. 2018) (citations omitted) ("The public trial right is concerned with the public's *presence* during (or access to) the trial. So where no one is excluded from the courtroom, it simply isn't implicated."). Appellant has not drawn our attention to any case finding a Sixth Amendment or R.C.M. 806 violation under these circumstances.

In addition, there is a qualitative difference between closing trial proceedings, and thereby preventing public observation of the conduct of trial, and merely not displaying exhibits to the gallery. Documentary court-martial exhibits of various types are routinely entered into evidence and published to court members without being displayed to spectators. Despite not having access to these exhibits, the spectators were nevertheless able to observe the conduct of the court-martial, including the testimony of witnesses, statements and arguments of counsel, and rulings by the military judge—thereby serving to ensure Appellant received a fair trial. *See Waller*, 467 U.S. at 46 (citations omitted) (stating "a public trial encourages witnesses to come forward and discourages perjury," and "ensur[es] that judge and prosecutor carry out their duties responsibly").

Accordingly, although the military judge did not explain his reasons for restricting the spectators' view of Prosecution Exhibits 1 and 2, we are not persuaded his actions clearly or obviously infringed upon Appellant's right to a public trial. Therefore, Appellant is not entitled to relief on that basis.

**E. Post-Trial Delay**

**1. Additional Background**

Appellant was sentenced on 3 February 2023, and the military judge signed the entry of judgment on 17 March 2023. On 14 July 2023, the Government mailed Appellant a written notification of his right to appeal to this court within 90 days of receipt of the notification. Appellant filed with this court a timely notice of appeal, through counsel, on 10 October 2023.

On 24 October 2023, this court docketed Appellant's case and ordered the Government to "forward a copy of the record of trial to the court forthwith." On 5 February 2024, not having received the record of trial, this court ordered counsel for the Government to "inform the court in writing not later than 29 February 2024 of the status of this case . . . ." On 29 February 2024, the Government responded that the court reporter was then transcribing another case, and would begin transcribing Appellant's case once the other case was complete. On 26 June 2024, still not having received the record, this court ordered the Government to provide a copy of the record to the court no later than 26 July 2024 or, failing that, provide the court with weekly status updates beginning on 27 July 2024.

The Government did not deliver the record of trial by 26 July 2024, but did begin delivering status updates in the form of memoranda signed electronically by the court reporter. These memoranda reflect that the court reporter completed transcribing the verbatim transcript on 25 June 2024 and delivered it to the base legal office for "final processing," and that as of late July 2024 the base legal office had sent the record to the Military Justice Law and Policy Division at Joint Base Andrews. This status remained unchanged until the 22 August 2024 memorandum, which advised the electronic record of trial "was not uploaded correctly," and the base legal office was in the process of removing it and reformatting it to re-upload. The court ultimately received the record of trial, including a verbatim transcript, on 12 September 2024.

In the meantime, on 1 August 2024, Appellant filed with the court a demand for speedy appellate review.

After the court received the record, Appellant requested and received nine enlargements before filing his assignments of error on 15 August 2025. The Government filed its answer brief on 24 October 2025 after receiving two enlargements of time. Appellant filed a reply brief on 7 November 2025.

**2. Law**

We review de novo whether an appellant is entitled to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

In *Moreno*, the CAAF established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the CCA within 30 days of the convening authority's action, or (3) the CCA did not render a decision within 18 months of docketing. 63 M.J. at 142.

In *Livak*, this court recognized that "the specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules." 80 M.J. at

633. Accordingly, this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases that were referred to trial on or after 1 January 2019. *Id.* (citation omitted).

However, in light of subsequent statutory changes, this court has found the 150-day threshold established in *Livak* does not apply to appeals, such as Appellant's, that are submitted under the amended Article 66(b)(1)(A), UCMJ, effective 23 December 2022, often known as "direct appeals." *See United States v. Boren*, No. ACM 40296 (f rev), 2025 CCA LEXIS 103, at *47 (A.F. Ct. Crim. App. 19 Mar. 2025) (unpub. op.). In *Boren*, this court noted, "[t]hese statutory changes substantially altered the sequence of post-trial events in such [direct appeal] cases" as compared to the mandatory review cases our superior court contemplated in *Moreno*. *Id.* at 47–48. Although we acknowledge appellants in such cases still enjoy constitutional due process rights to timely post-trial review, we decline to establish a new specific timeframe for a facially unreasonable delay from sentence-to-docketing in direct appeal cases.

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). In *Barker*, the Supreme Court also identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations and footnotes omitted). "Of those, the most serious is the last [type], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Additionally, where an appellant has not shown prejudice from the delay, we cannot find a due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Independent of any due process violation, this court may provide appropriate relief where there is "excessive delay in the processing of the court-martial after the judgment was entered into the record." *United States v. Valentin-Andino*, 85 M.J. 361, 364 (C.A.A.F. 2025) (citing Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2)). If a CCA decides relief is warranted for excessive post-trial delay under Article 66(d)(2), UCMJ, "that relief must be 'appropriate,' meaning it must be suitable considering the facts and circumstances surrounding that case." *Id.* at 367. "This does not require a [CCA] to provide relief that is

objectively meaningful, and it does not obligate a [CCA] to explain its reasoning regarding the relief it does provide." *Id.*

### 3. Analysis

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights.

Significantly, we are not persuaded Appellant suffered cognizable prejudice from the Government's delay in delivering the record of trial to this court. Appellant did not receive a punitive discharge, and he asserts prejudice in that he has been "unable to fully resume his [Air Force] career or move to the next chapter of his life" while his appeal has remained pending. If Appellant's substantive grounds for appeal were meritorious, we might be inclined to agree. However, we have not found prejudicial error in Appellant's court-martial that warrants relief, and therefore the delay has not deprived Appellant of such relief. In the meantime, so far as the record indicates, after his confinement Appellant continued to serve as a noncommissioned officer in the Air Force in the grade of E-6. Under these circumstances, we are not persuaded Appellant experienced anxiety or concern materially "distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Moreno*, 63 M.J. at 139. In addition, we do not find Appellant suffered oppressive incarceration or prejudice to his grounds for appeal or ability to defend himself at a rehearing. *See id.* at 138–40.

Absent prejudice, we find the delay has not been so egregious as to adversely affect public perception of the military justice system. This court's opinion is being issued approximately 26 months after docketing, eight months beyond the *Moreno* standard for facially unreasonable delay. Undeniably, the Government's delay in producing a verbatim transcript and delivering the record greatly contributed to the delay. The record is substantial, comprising seven volumes including 985 pages of transcript; but it is not so unusually large as to account for the Government's delay. However, Appellant's nine motions for enlargement of time significantly contributed to the delay. Had Appellant promptly filed his assignments of error within 60 days of the court's receipt of the record, this court likely could have released its opinion within the 18-month *Moreno* standard.[8] Considering the *Barker* factors and the circumstances as a

---

[8] *See* JT. CT. CRIM. APP. R. 18(d)(1) (2019, amended 17 May 2024) ("An appellant's brief shall be filed no later than 60 days after the Court has received the record of trial . . . and has docketed the case.").

whole, absent prejudice, in light of the CAAF's guidance in *Toohey*, 63 M.J. at 362, we do not find a violation of Appellant's constitutional due process rights.

However, we find the Government's delay sufficiently excessive to warrant relief pursuant to Article 66(d)(2), UCMJ. Of note, on 24 October 2023, this court ordered the Government to "forward a copy of the record of trial to the court forthwith." *See* MERRIAM-WEBSTER, *Forthwith*, www.merriam-webster.com/dictionary/forthwith (last visited 8 Dec. 2025) (defining "forthwith" as "without any delay" or "immediately"). The Government appears to have effectively ignored the court's order until this court ordered the Government to respond in February 2024, when the Government advised the court reporter was transcribing another case and had not begun transcribing Appellant's record. Thus, in spite of the court's order to prioritize the delivery of Appellant's record, the Government evidently chose to prioritize other matters. Moreover, the court reporter would not complete the transcript for another four months, and once the transcript was prepared on 25 June 2024, it took another two-and-a-half months to successfully deliver the complete record to the court. The Government has not provided a reasonable justification for the delay. Accordingly, we find it appropriate to partially disapprove Appellant's term of confinement and reduction in rank for the excessive delay.

## III. Conclusion

As entered, the findings are correct in law. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2024 *MCM*). We affirm only so much of the sentence as provides for confinement for 30 days, reduction to the grade of E-6, and a reprimand. The sentence, as modified, is correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence, as modified, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

23